FRANCIS POIRIER *vs.* TOWN OF PLYMOUTH.

Plymouth. May 4, 1977. — January 10, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Evidence,* Relevancy and materiality. *Negligence,* Ladder, Toward employee of independent contractor, One owning or controlling real estate, Duty to warn. *Workmen's Compensation Act,* Common employment, Action against third person.

In a tort action for injuries sustained by the plaintiff in falling from a ladder on the side of a town's water tank when an interconnection between a stationary ladder and a revolving ladder allegedly broke, there was no error in the admission of evidence that one of the plaintiff's coworkers had found part of a broken bolt in the grass beneath the ladder after the accident [209-210]; nor was there error in admitting in evidence certain plans for the construction of the tank [210-211]; nor was there error in the admission of certain standards for the

inspection and repair of water storage tanks promulgated by the American Water Works Association [211-212].

In a tort action for injuries sustained by the plaintiff in falling from a ladder on the side of a town's water tank, there was sufficient evidence to warrant a finding that the plaintiff's fall was due to a "hidden defect" and that the defendant, in the exercise of reasonable care, should have been aware that the defect existed. [212-216] BRAUCHER, J., concurring in the result.

The painting of a town's water tank by an independent contractor was, as matter of law, "merely ancillary and incidental to . . . the trade or business carried on by" the town's water department within the meaning of G. L. c. 152, § 18. [216-219]

The hidden defect rule, as expressed in *Afienko* v. *Harvard Club of Boston,* 365 Mass. 320 (1974), is no longer to be applied in cases involving tort actions against landowners; the duty and standard of care owed by the property owner to the employee of an independent contractor is the same as that owed all other lawful visitors on the premises. [219-228] QUIRICO, J., with whom HENNESSEY, C.J., and WILKINS, J., joined, concurring in the result.

TORT. Writ in the Superior Court dated December 19, 1966.

The action was tried before *Lappin,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Cortland A. Mathers* for the plaintiff.

*Philip M. Cronin* for the defendant.

LIACOS, J. The plaintiff was an employee of an independent contractor engaged by the town of Plymouth (defendant) to paint the defendant's water tank. The plaintiff was climbing the tank on a stationary ladder affixed to one of its supporting legs and was thrown about thirty-five feet to the ground while attempting to continue his climb by going up onto a second ladder suspended from the top of the tank. The plaintiff brought this action of tort and had verdict and judgment for $60,000 on the trial judge's charge that the defendant "owed him the same duty it owed its own employees — to disclose hidden or concealed defects on the premises of which it was aware or should have been aware through the exercise of reasonable care." *Afienko* v.

*Harvard Club of Boston,* 365 Mass. 320, 327-328 (1974), and cases cited. The Appeals Court set aside the verdict and entered judgment for the defendant on the ground that the plaintiff had failed to sustain his burden of introducing evidence sufficient to warrant a finding of a hidden defect on the defendant's premises. *Poirier* v. *Plymouth,* 4 Mass. App. Ct. 665, 670 (1976).

We allowed the plaintiff's application for further appellate review. We now order that the judgment for the plaintiff entered by the Superior Court be affirmed. In so doing, we conclude that the plaintiff did sustain his burden of introducing evidence sufficient to warrant a finding of a hidden defect on the defendant's premises. Additionally, a majority of the Justices conclude that the hidden defect rule as presently understood is not consistent with recent decisions of this court and no longer is to be applied in cases involving tort actions against landowners (see part 4, *infra*).

The Appeals Court did not reach several evidentiary questions raised by the defendant which, under our disposition of the case, require some consideration. To put these questions in context, we proceed first to a summary of the facts.

The record shows that the water tank was supported by four legs extending to a height of about thirty-five feet, on one of which was attached a fixed ladder. This fixed ladder was utilized by the plaintiff to make his ascent on the day of his accident. This ladder, referred to in the evidence as the "stationary ladder," ended approximately two feet below the bottom edge of the body of the water tank. The only aid in proceeding up the body of the tank was provided by a "revolving ladder," which was attached to a pivot at the top of the tank and then proceeded downward, following the slope of the tank, until the bottom of the revolving ladder was at the same level as the top of the stationary ladder. Due to the pivotal attachment at the top of the tank, the revolving ladder was capable of being rotated around the circumference of the tank.

On December 20, 1965, the plaintiff and two other members of the painting crew arrived at the tank. The stationary and revolving ladders were observed to be vertically aligned, and one of the plaintiff's coworkers, Milton Sherman, proceeded up both ladders to the top of the tank and then descended without incident. Subsequently the plaintiff began his ascent of the stationary ladder with Sherman climbing two or three rungs behind. The accident occurred at the time the plaintiff reached the juncture of the two ladders. The plaintiff was standing with his feet on the upper rungs of the stationary ladder and his hands on the lower rungs of the revolving ladder when the revolving ladder "sprung out," according to the testimony of Sherman, striking the plaintiff in the chest and throwing him away from the tank and to the ground. The plaintiff suffered severe injuries.

A great deal of effort was expended in the trial court to determine the precise nature of the connection, if any, between the stationary and revolving ladders just prior to the mishap. The plaintiff's theory was that a single bolt had been inserted through corresponding holes in the two ladders but had broken off when the plaintiff transferred his weight to the revolving ladder. The defendant insisted that there could not have been any kind of permanent connection between the two ladders since that would have negated the purpose of the rotating ladder, and that there was insufficient evidence of the existence of a bolt, or any other means of connection. In addition to its contention that the cause of the accident was "totally speculative" and should not have been submitted to the jury for determination, the defendant raises several claims of error as to the admission of evidence which we now consider.

1. The plaintiff's coworker, Milton Sherman, testified over the defendant's objection that he had returned to the site of the accident later in the day and discovered a part of a bolt in the grass beneath the ladders. The whereabouts of the bolt at the time of trial was unknown. The defendant insists that it is "sheer guesswork" to conclude that the broken bolt had ever connected the ladders, or that if so, that it had

broken at the time of the plaintiff's ascent on the ladders. The question of the sufficiency of this evidence, which the defendant raises, is a distinct question from that of the propriety of its admission in evidence. The general rule to be followed in this Commonwealth is that all relevant evidence is admissible unless within an exclusionary rule. Evidence is relevant if it renders the desired inference more probable than it would be without the evidence. *Green* v. *Richmond*, 369 Mass. 47, 59 (1975). *Crowe* v. *Ward*, 363 Mass. 85, 89 (1973). Evidence may be sufficiently relevant to be admitted if it "tends to establish the issue" or "constitutes a link in the chain of proof." *Commonwealth* v. *Abbott*, 130 Mass. 472, 473 (1881). Sherman's testimony concerning his discovery of the broken bolt was properly admitted as tending to support the plaintiff's theory; the probative value to be attached to the testimony was a matter for the jury.

The defendant's next claim of error involves the admission in evidence of several exhibits consisting of plans for the construction of the water tank in question. The defendant notes that revisions had been entered on the plans as late as 1941, subsequent to the actual construction of the tank in 1932. The defendant also notes that the plaintiff's engineering expert, relying on the plans as revised, testified that the two ladders were capable of being bolted together. This testimony, according to the defendant, was therefore unreliable and prejudicial. Again, the defendant's argument is more properly aimed at the weight to be given the evidence than at its admissibility. The trial judge was most careful in assuring that a proper foundation for the construction plans was laid under the business records exception to the hearsay rule, G. L. c. 233, § 78. In the course of that inquiry he took specific note, at the defendant's insistence, of the fact that revisions had been made. The judge, in his discretion, admitted the revised plans for whatever probative value they carried. The relevance of such plans for purposes of admission is a matter within the sound discretion of the judge. See *Boucher* v. *Robeson Mills*, 182 Mass. 500 (1903); *Blair* v. *Pelham*, 118 Mass. 420 (1875). We see no reason on this

record to disturb the judge's ruling as to the admissibility of the plans. *Sellew* v. *Tuttle's Millinery, Inc.*, 319 Mass. 368 (1946).

Next, the defendant charges error in the admission in evidence of certain standards for the inspection and repair of water storage tanks promulgated by the American Water Works Association (AWWA). There was evidence that the superintendent of the Plymouth water department was aware of the AWWA standards and that the standards had been approved by the regional water works association to which the superintendent belonged. The judge allowed the AWWA standards in evidence as bearing on the issue whether the defendant had failed in its duty to periodically inspect the water tank and, in particular, the ladders attached thereto. This inquiry is entirely consistent with the standard of care imposed by *Afienko* v. *Harvard Club of Boston*, 365 Mass. 320, 327-328 (1974), that the defendant disclose hidden or concealed defects of which it was aware or should have been aware through the exercise of reasonable care. The AWWA standards, being evidence of preferred methods of operation and accepted trade practice, tend to establish the custom with regard to inspection. These standards are probative in determining whether the defendant was negligent in not being aware of any hidden defects. *Stewart* v. *Roy Bros.*, 358 Mass. 446, 452 (1970). The defendant objects, however, that the requirements of the AWWA standards that an inspection determine if a ladder is "safe" go beyond the *Afienko* standard which would impose no duty on the defendant if the defective condition of the ladder were obvious. The judge was aware of the potential for confusion on the part of the jury when asked to distinguish between (1) the employer's duty to become aware of hidden defects, a duty measured by ordinary reasonableness, and (2) the general standard of care, which is limited to disclosing those hidden defects that reasonably could be discovered. The judge referred to this distinction when he admitted the AWWA standards in evidence and again when he charged the jury. His frequent and clear ref-

erences to the *Afienko* standard made it clear beyond any confusion on the part of the jury as to the limited purpose for which they were to consider this evidence.

Other objections to the admission of evidence raised by the defendant have been reviewed by us and are equally without merit.

2. We are now in a position to address the contention of the defendant that the jury should not have been allowed to decide the issue of negligence, that is, that there was error in denying the defendant's motion for a directed verdict. The question is whether the evidence, construed most favorably to the plaintiff, could not support a verdict for the plaintiff. *Grant* v. *Carlisle,* 328 Mass. 25 (1951). More specifically, the test has been stated as whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Raunela* v. *Hertz Corp.,* 361 Mass. 341, 343 (1972). That the inferences be reasonable requires that they be based on "probabilities rather than possibilities" and not the result of "mere speculation and conjecture." *Alholm* v. *Wareham,* 371 Mass. 621, 627 (1976).

The defendant challenges the sufficiency of the plaintiff's proof regarding the existence of a "hidden defect." Avoiding, for the moment, any diversion into the controversy over the existence of a bolt, there appears to us to be ample evidence on which a jury could conclude that a hidden defect caused the accident. The plaintiff's coworker, Sherman, testified that the revolving ladder sprang out "like a jack-in-a-box" when the plaintiff put his weight upon it, thrusting the plaintiff backward and to the ground. According to Sherman, who was only a few feet beneath the plaintiff at the time of the occurrence, the plaintiff "didn't let go [of the ladder]. I guess he was knocked loose." Believing this testimony, as the jury were entitled to do, a reasonable person could well conclude that the ladder was not intended to act as a catapult and that whatever caused or allowed this unexpected action constituted a "defect." Moreover, the

evidence is clear that the defect was "hidden." The ladders were vertically aligned and there was evidence they appeared to be "attached," "locked," "hooked," "tied," or "bolted," one to the other. This appearance could be found to give neither Sherman nor the plaintiff any cause to expect that the revolving ladder would spring outward. In short, this was not a circumstance in which the danger was "obvious" or one discoverable by "reasonable inspection." Cf. *Burr* v. *Massachusetts Elec. Co.*, 356 Mass. 144, 147 (1969). This is not to deny that causes other than the inferred defect, such as negligence on the part of the plaintiff in applying his weight to the revolving ladder, could conceivably have resulted in the motion of the ladder and the injury to the plaintiff. However, the jury received an entirely adequate charge on the issue of contributory negligence and found for the plaintiff.[1] It is not the role of an appellate court to substitute its judgment for that of the fact finder when reasonable conclusions based on reasonable inferences have been made.

On the evidence before it the jury properly could have found that (a) the plaintiff and his fellow workers were expected to paint the entire tank; (b) this work would require

---

[1] The defendant claims no error as to the charge on contributory negligence. The statute providing for the use of the comparative negligence standard was not applicable to this case as the cause of action arose prior to its effective date. See G. L. c. 231, § 85, as amended by St. 1969, c. 761, §§ 1, 2 (effective January 1, 1971, and applicable to causes of action arising on or after that date), and as further amended by St. 1973, c. 1123, § 1. Analytically, the question whether the plaintiff was contributorily negligent may subsume the inquiry whether the plaintiff made a "reasonable inspection" to discover any defect. A finding that the plaintiff was not contributorily negligent would appear to necessarily imply that the plaintiff satisfied the burden of care imposed on employees by the hidden defect test — that a reasonable inspection be made. The effect of this test, viewed in terms of burden of proof, would appear to be to shift from the defendant the burden of pleading and proving facts that might otherwise support a finding of contributory negligence and impose on the plaintiff the burden of proving both that he could not have discovered the defect by reasonable inspection and that the defendant could have discovered the defect by the exercise of reasonable care. See *Hannon* v. *Hayes-Bickford Lunch Sys., Inc.*, 336 Mass. 268, 272 (1957).

them to ascend to the top thereof; (c) the presence, location, appearance and alignment of the two ladders were such as to indicate to a reasonable workman that the way to reach the top was to climb them; (d) while the plaintiff was doing so in a manner not contributorily negligent the ladders parted suddenly and without warning, throwing the plaintiff to the ground; (e) the reason they parted was because the ladders were not joined as they appeared to be or, if so, they were defectively joined.

Under this view, it is not necessary to inquire further into the precise nature of the defect. Even if such an inquiry were necessary, the jury could have found on the evidence that the sudden snapping of a rusted bolt allowed the two ladders to part under the strain of the plaintiff's weight. Sherman testified that he found part of a rusty bolt at the base of the ladder following the accident, on one end of which a nut was still in place and the other end of which tapered down to what appeared to be a recent cleavage. He further testified that there was a hole on each side of the revolving ladder near the bottom of the ladder, that the hole on the right side was smooth and painted on the inside, and that the hole on the left side was rusty on the inside, thereby raising the inference that the bolt had been inserted in the hole on the left side. That the bolt itself was not introduced in evidence, that no measurement of the bolt had been made and that no attempt had been made to insert the bolt into the hole in the ladder, all are factors going to the weight to be attached to the plaintiff's bolt theory. We cannot say that the inference that the ladders were bolted together is in the nature of "mere speculation and conjecture" so as to require that consideration of the question be withheld from the jury.[2] See *Alholm* v. *Wareham*, 371 Mass. 621, 626-627 (1976).

---

[2] At the trial, counsel for the plaintiff put a hypothetical question to his expert witness, one of the assumptions of which was that a broken bolt had been found under the ladders at the base of the tank. Counsel for the defendant objected, interpreting this assumption as including the proposition that the bolt, in fact, came from between the ladders. Counsel for the

The evidence reasonably warranted a jury finding that a "hidden defect" existed whether it concluded that the ladders were defectively joined by a bolt that failed or whether they concluded there was no joining mechanism or device holding the two ladders together.

In addition to the burden of proving that his injury was caused by the defendant's failure to warn of a hidden defect, the plaintiff under the *Afienko* test has the burden of showing that the defendant, in the exercise of reasonable care, should have been aware that the defect existed. *Hannon* v. *Hayes-Bickford Lunch Sys., Inc.*, 336 Mass. 268, 272 (1957). The plaintiff elicited testimony from the superintendent of the Plymouth water department that the town had not inspected the water tank during the five years preceding the accident. There was evidence that the proximity of the tank to the ocean subjected it to marine corrosion, and that high winds caused the tank to sway. The AWWA standards suggested that water tanks "be carefully inspected prior to . . . painting," and periodically inspected at intervals of not more than five years. Further, the inspection should be undertaken only by qualified specialists. Although these evidentiary factors, taken separately or together, did not conclusively establish whether the defendant satisfied its duty to exercise reasonable care in becoming aware of any hidden defects, they were sufficient to allow the jury to make that determination; the jury could reasonably have concluded that the town was remiss in failing to inspect the tank prior to the painting assignment of the plaintiff and his coworkers. The question is then presented whether there was sufficient evidence to conclude that the

---

plaintiff then withdrew any such assumption from the question notwithstanding his contention that the jury were free to draw an inference that the bolt came from between the ladders. The withdrawal of the assumption was precipitated by the judge's remarks that, although the jury were free to draw such an inference, the expert's opinion, to be valid, had to be based on "facts." Irrespective of the accuracy of the judge's remark — a question we need not reach — it is clear to us that the judge did not intend to indorse the view that an inference that the ladders were bolted together was mere speculation or conjecture.

defect would have been discovered in the course of a reasonably careful inspection by the defendant. It appears from the evidence, and it is not disputed, that the plaintiff climbed the ladders in a normal fashion, subjecting them to no unusual or extraordinary stresses. Whether the sudden and violent parting of the ladders was precipitated by the failure of a bolt or any other means of connection, the jury could reasonably infer that, had an inspector examined the ladders at the point of failure, the dangerous hidden condition would have been discovered.

The Appeals Court, as a result of its considerations of these issues, held that the jury could have found that the sudden failure of a bolt allowed the revolving ladder to snap away from the side of the tank, throwing the plaintiff to the ground. 4 Mass. App. Ct. at 668. That court concluded, however, that such a finding was not sufficient to establish the existence of a defect as matter of law. It reasoned that the purpose of the bolt, or any other connection, could as well have been to prevent the ladder from revolving around the tank as to prevent the ladder from springing out. Therefore, the court concluded, neither purpose could be said to have been proven since the evidence tended equally to sustain each of two inconsistent propositions. *Id.* at 669-670.

We cannot accept this reasoning. Whatever its intended function, the connection failed when subjected to the foreseeable stress of a man's weight, thereby unleashing the force of the ladder. The defective condition thus was composed of two distinct elements: the fragility of the connection and the instability of the revolving ladder. The jury could thus reasonably find the defendant negligent in failing to prevent the dangerous condition presented by the inadequately secured ladder irrespective of the specific purpose for which the bolt or connection was intended.

3. The defendant raises an additional issue to which we now turn — whether the judge erred in refusing to charge the jury that provisions of the Workmen's Compensation Act, G. L. c. 152, present a bar to the plaintiff's recovery.

In the course of rationalizing and applying the statutory scheme of G. L. c. 152, §§ 15, 18,[3] and 24, this court announced what has become known as the "common employer" doctrine: "The insurance of the general contractor or 'common employer' [citation omitted] throws its shadow over the whole work. In that shadow (unless there has been a written notice under § 24 reserving common law rights) a cause of action for negligence causing a compensable personal injury cannot grow." *Clark* v. *M.W. Leahy Co.,* 300 Mass. 565, 568 (1938).[4] The defendant, maintaining that it is a common employer, thus argues that it enjoys immunity from tort suit.

The scope of the common employer doctrine is limited, however, by the express language of § 18, from which the doctrine grew. "This section shall not apply to any contract

---

[3] The term "insured person," or "insured," in § 18 is defined as "an employer who has provided by insurance for the payment to his employees by an insurer of the compensation provided for by this chapter, or is a self-insurer under subsection 2(*a*) or 2(*b*) of section twenty-five A." G. L. c. 152, § 1 (6). The defendant argues that this definition of "insured person" is broad enough to include an employer which is a city or town, citing our decision in *Pettiti* v. *Edward J. McHugh & Son,* 341 Mass. 566 (1960), thus making applicable the "common employer" doctrine of immunity from tort suit derived judicially from the interrelationship between G. L. c. 152, §§ 15, 18, and 24. We do not reach this issue, however, in view of our conclusion, *infra,* that the contract between the defendant and the plaintiff's employer called for services which were plainly "ancillary and incidental to, and . . . no part of or process in, the trade or business carried on by" the defendant. G. L. c. 152, § 18. See *Moschella* v. *Quincy,* 347 Mass. 80, 83-84 (1964).

[4] Section 15 was amended by St. 1971, c. 888, § 1, and St. 1971, c. 941, § 1. The former amendment is not relevant to the issues of this case.

Under the second amendment to § 15 introduced by St. 1971, c. 941, § 1, the common employment doctrine was effectively abolished. Applicable to injuries arising on or after January 24, 1972 (St. 1971, c. 941, § 2), § 15 now provides that: "Nothing in this section, or in section eighteen or twenty-four shall be construed to bar an action at law for damages for personal injuries or wrongful death by an employee against any person other than the insured person employing such employee and liable for payment of the compensation provided by this chapter for the employee's personal injury or wrongful death and said insured person's employees." Cf. *Brown* v. *Marr Equip. Corp.,* 355 Mass. 724 (1969).

of an independent or sub-contractor which is merely ancillary and incidental to, and is no part of or process in, the trade or business carried on by the insured . . . ." G. L. c. 152, § 18. The crucial question is whether or not the work carried on by the plaintiff was "merely ancillary" to the business carried on by the town water department. In this inquiry we are guided by numerous precedents, fairly summarized in the observation that maintenance and repair work "which [is] required only occasionally and involve[s] extensive alterations or the servicing of specialized equipment beyond the competence of [the insured employer's] regular staff, may be found to be 'merely ancillary and incidental' to the business of the insured employer." L. Locke, Workmen's Compensation § 154, at 188 (1968), and cases cited. The two guidelines provided by this formulation are thus that (1) the work in question be of a nonroutine nature and that (2) an expertise be required to perform it. Another formulation frequently relied on to distinguish work which is "merely ancillary" to the business of the employer from that which is "part of or process in" such business is that applied by this court in *Cannon* v. *Crowley*, 318 Mass. 373, 375 (1945): "The character and nature of the business must be determined, and if the work done by an independent contractor is really a branch or department of that business or a process in the business, it constitutes a part of the business itself. If it is customary for those engaged in a similar business to perform the work by their own employees in the ordinary course of the business or if, whatever the custom is, one so engaged usually has such work performed by his own employees, then such work may be found to be a part of his business."

Applying these guidelines to the case at hand, we conclude that the services to be performed by the plaintiff fall squarely within the category of "ancillary" or "incidental" work. The task of sanding and grinding rust spots and then painting the water tank at a height of between thirty-five and fifty feet obviously calls for a specially equipped crew. It is easily distinguished from the type of routine painting of

hydrants and pipes, painting over graffiti, and other maintenance carried on by the defendant's own employees. The job of painting the tank was undertaken only occasionally — prior to the accident in 1965, the tank was painted in 1960 and 1952 — and the work was, as far as the record shows, consistently awarded to independent contractors. Thus, it could not be found that the plaintiff's work constituted a "branch or department" of the defendant's business of selling and distributing water to Plymouth consumers, and the judge did not err in deciding this question as matter of law. Although this question is ordinarily one of fact to be decided by the jury, *Afienko* v. *Harvard Club of Boston*, 365 Mass. 320, 325 (1974), it is one of law where the record supports the conclusion either that the work plainly is, or plainly is not, part of the principal employer's trade or business. *Tindall* v. *Denholm & McKay Co.*, 347 Mass. 100 (1964). *Bencivengo* v. *Walter C. Benson Co.*, 319 Mass. 110 (1946). *Whitehouse* v. *Cities Serv. Oil Co.*, 315 Mass. 108, 112 (1943). See *Stewart* v. *Roy Bros.*, 358 Mass. 446, 455-457 (1970).

4. Having reviewed all of the defendant's objections as well as the opinion of the Appeals Court, we conclude that the plaintiff has made out his case under the applicable existing law — the *Afienko* "hidden defect" test — and is entitled to have his verdict and judgment in the Superior Court reinstated. A majority of the Justices of this court are now willing to state that the close scrutiny we have given to the practical operation of the "hidden defect" test has for us brought into sharper focus its deficiencies and contradictions. Moreover, the policies underlying this common law test are revealed as markedly out of step with the recent and pronounced movement of this court in the reformation of duties of care in other areas of tort law. We have concluded, therefore, that to the extent *Afienko* stands for the proposition that a plaintiff has the burden of establishing that his injury was the result of a hidden defect of which the landowner defendant was aware or should have been aware through the exercise of reasonable care it is overruled.

The *Afienko* doctrine had its origins, as we shall demonstrate, in the principles of law governing the duties of an employer to his employees.

The tort duty of care owed by an employer to his employee or to the employee of an independent contractor (in circumstances where G. L. c. 152 does not apply) is stated in terms of an exception — only where there is a hidden defect or danger does a duty of care exist at all. The general rule is that the employer owes no duty to alter the condition of his premises to make them safe for the employee. *Burr* v. *Massachusetts Elec. Co.*, 356 Mass. 144, 147 (1969). *Williams* v. *United Men's Shop, Inc.*, 317 Mass. 319, 320 (1944).

Much of this development of the common law doctrine occurred prior to the enactment of G.L. c. 152 which provided an alternative method of distributing the economic loss when an employee is killed or injured as a result of an injury arising out of his employment. See L. Locke, Workmen's Compensation §§ 21-31 (1968). The Workmen's Compensation Act effectively displaced the need to apply common law principles in most cases of employee injury, but the common law principles as to liability continue to have vitality where G. L. c. 152 does not apply. The "hidden defect" rule, where applicable, thus has defined in part the duty of an "employer" to an "employee" whether the relationship of the defendant and the plaintiff is that of employer-employee or whether, as here, the "employer" defendant is a landowner who engages an independent contractor whose employee is injured in the course of the employment. Thus the "employee" referred to in the "hidden defect" rule may in fact not be employed by the defendant. While we use here the customary term "employee" in our analysis of the relevant authorities, we limit our discussion to the factual situation before us, namely to that of an injury suffered by one not an employee of the defendant landowner but instead the employee of an independent contractor engaged by a defendant to do work on the property of the defendant.

Under the hidden defect rule the injured employee is in the position of one who has assumed all risks except those that he can prove were "hidden." *Pettingill* v. *Porter & Son*, 219 Mass. 347, 349 (1914). The obstacles to proving a defect or danger "hidden" are substantial: the defect must not be obvious, that is, it must not be capable of being discovered by the employee in the course of a "reasonable inspection," *Hannon* v. *Hayes-Bickford Lunch Sys., Inc.*, 336 Mass. 268, 272-273 (1957); the defect also must be discoverable by the employer in the exercise of "reasonable care," *id.* at 272. Thus, absent actual knowledge being shown on the part of the employer, the defect must be too hard for the employee reasonably to discover but not too hard for the employer reasonably to discover. The burden of making this nice distinction rests on the employee. Where, as in the instant case, the employer has not attempted to inspect, the employee's difficulties are compounded by the requirement that he show hypothetically that the reasonably careful employer would have discovered the defect even though he, the employee, in fact did not discover it.

Were there strong social policy reasons to maintain the hidden defect test, the hurdles thrown in the path of the injured employee of an independent contractor might be unobjectionable. Recent decisions of this court clearly reflect, however, a shift in philosophy with regard to status distinctions in tort standards of care, casting great doubt on the continuing relevancy of this aspect of the common law hidden defect test, at least in so far as it relates to a defendant landowner. A brief analysis of the decisions will serve to confirm this view.

In *Mounsey* v. *Ellard*, 363 Mass. 693 (1973), the plaintiff, a police officer, was injured on the defendant's premises. Because the plaintiff had been acting in his official capacity at the time of the injury, the existing common law rule classified the plaintiff as a licensee and therefore required that he establish wilful, wanton or reckless conduct, and not just ordinary negligence, on the defendant's part. Noting that the common law distinction between licensees and in-

vitees[5] had emerged in English common law at a time when the law attached supreme importance to a landowner's property interests, this court in *Mounsey* determined that the practice of varying the landowner's liability according to the legal status of the plaintiff "no longer comport[s] with modern accepted values and common experience . . . ." *Id.* at 703. We therefore determined to break away from the old common law notions and, instead, "create a common duty of reasonable care which the occupier owes to all lawful visitors." *Id.* at 707. Undeniably, our action in *Mounsey* was motivated in part by the confusion and inconsistencies resulting from attempts to apply the common law distinctions between licensees and invitees. An equally important rationale may be as forcefully applied to the duty of care owed an employee of an independent contractor as it was to the care owed a licensee or invitee: "The problem of allocating the costs and risks of human injury is far too complex to be decided solely by the status of the entrant, especially where the status question often prevents the jury from ever determining the fundamental question whether the defendant has acted reasonably in light of all the circumstances in the particular case." *Id.*

In a further reexamination of status distinctions in tort law, this court in *Lindsey* v. *Massios,* 372 Mass. 79 (1977), abolished the common law rule regarding the standard of care owed by a landlord to his tenant's visitors injured in common passageways. A landlord had been obliged to use reasonable care with regard to common passageways only to the extent of maintaining such common passageways in the same condition as they were or appeared to be in at the time

---

[5] The special legal status of trespassers, the third common law category of visitors on another's land, was not affected by our decision in *Mounsey.* 363 Mass. at 707 n.7. Although we acknowledged that other courts had placed trespassers in the same legal status as licensees and invitees, we chose to maintain a distinction between lawful and unlawful visitors. But see *Pridgen* v. *Boston Hous. Auth.,* 364 Mass. 696, 706-711 (1974) (owner or occupier of property owes a duty to exercise reasonable care to prevent injury or further injury to a trespasser in a known position of peril).

of the letting.[6] Reasoning that "the status of the person visited, landowner or lessee, should not affect the visitor's right to personal safety or the landowner's obligation reasonably to maintain premises in his control," we invoked the *Mounsey* rationale to impose a duty of reasonable care on the landlord with respect to all lawful visitors. *Id.* at 82. We thus recognized that the legal relationship between landlord and tenant was not a rational basis for distinguishing the duty owed by the landlord to his tenant's visitors from that owed to other lawful visitors.[7] Similarly, the employee of an independent contractor engaged to work on the property of a property owner is a "lawful visitor" on the premises and is owed a duty of reasonable care without regard to status as an invitee, licensee, or employee of the independent contractor. The view that the relationship between a property owner and the injured employee of an independent contractor sufficiently distinguishes the duty of care applicable to this class of tort action from the duty applicable among most other members of society appears to us to be contrary to logic and sound modern values.

The anachronistic nature of the rule is somewhat obscured by its classification as a standard of care owed by the defendant. In philosophy and practical effect the rule might be more accurately viewed as a doctrine of assumption of the risk, or, perhaps, contributory negligence.[8] Rec-

---

[6] The facts of that case gave us no occasion to reconsider the application of this standard of care to the landlord's tenants. 372 Mass. at 82 n.2. See also *Markarian v. Simonian*, 373 Mass. 669 (1977).

[7] We have most recently rejected the duality of approach pertaining to the duty of care owed a tenant by a landlord. *King v. G & M Realty Corp.*, 373 Mass. 658 (1977). In *King* we held that "the measure of the landlord's responsibility to the tenant with respect to common areas left in the landlord's control should not differ in kind from that owed by the landlord to the tenant's visitors." *Id.* at 661.

[8] Whereas the burden of proof under the hidden defect test falls on the plaintiff, the burden of proof of the affirmative defenses of assumption of risk and contributory negligence falls on the defendant. *Baldassari v. Produce Terminal Realty Corp.*, 361 Mass. 738, 745 (1972). This difference does not affect significantly the parallels we shall draw. In order

ognizing the substantial confusion which inevitably seems to infect attempts to dissect a negligence action along the lines of duty, contributory negligence and assumption of risk, we mention this alternative perspective only to emphasize the intimate connection between the hidden defect rule and recently discarded concepts. See G. L. c. 231, § 85, as appearing in St. 1969, c. 761, § 1, and as further amended by St. 1973, c. 1123, § 1 (limiting the effect of contributory negligence); *id.*, as appearing in St. 1973, c. 1123, § 1 (abolishing the defense of assumption of risk). A brief analysis of the application of the now discredited defense of assumption of risk to the liability of an employer for injuries to his employees will, it is hoped, allow clearer reflection on the weaknesses underlying the present hidden defect doctrine.

The early attitudes which gave birth to the doctrine of assumption of risk in employer-employee cases were explored by Mr. Justice Black in a case under the Federal Employers' Liability Act, 45 U.S.C. § 54 (1970): "Assumption of risk is a judicially created rule which was developed in response to the general impulse of common law courts . . . to insulate the employer as much as possible from bearing the 'human overhead' which is an inevitable part of the cost — to someone — of the doing of industrialized business." *Tiller* v. *Atlantic Coast Line R.R.*, 318 U.S. 54, 58-59 (1943). Any other rule " 'would not only subject employers to unreasonable and often ruinous responsibilities, thereby embarrassing all branches of business,' but would also encourage carelessness on the part of the employee." *Id.* at 59, quoting *Tuttle* v. *Detroit, G.H. & M. Ry.*, 122 U.S. 189, 196 (1887). As one commentator has noted, this attitude "is almost the exact antithesis of the philosophy which underlies workmen's compensation acts," the intent of which is to

to simplify our analysis, however, we shall focus exclusively on a comparison between the hidden defect and assumption of the risk doctrines, thereby taking advantage of the long-recognized analytical overlap between assumption of risk and contributory negligence. See *Engel* v. *Boston Ice Co.*, 295 Mass. 428, 436 (1936).

recognize work-related accidents as an inevitable cost of our economic system and to affect a distribution of that cost among the beneficiaries of the enterprise. 2 F. Harper & F. James, Torts § 21.4, at 1176 (1956). See Workmen's Compensation Act, G. L. c. 152.

That the same outmoded philosophy regarding allocation of the cost of work-related injury forms the basis of the hidden defect rule is obvious from a statement of the premises of that rule. As we have already noted, the employee assumes all risks except those that he can prove were "hidden." *Pettingill* v. *Porter & Son,* 219 Mass. 347, 349 (1914). In general, the employer owes no duty of care to alter the condition of his premises to make them safe for the employee. *Burr* v. *Massachusetts Elec. Co.,* 356 Mass. 144, 147 (1969). The employee thus may have no recovery in tort against an employer who has negligently created, or failed to correct, a dangerous condition which is not sufficiently obscured from a possible discovery by the employee to qualify as a hidden defect.

Moreover, an examination of the common law evolution of the hidden defect rule reveals it to be a corollary to, if not a derivative of, the doctrine of assumption of the risk. In the early case of *O'Maley* v. *South Boston Gas Light Co.,* 158 Mass. 135 (1893), the plaintiff-employee had been injured as a result of a fall from a wheelbarrow run in one of the defendant-employer's coal sheds. Negligence in not providing guard rails was charged, and the action was brought under a statute (St. 1887, c. 270) providing a remedy for defects "which arose from, or had not been discovered or remedied owing to, the negligence of the employer . . . ." *Id.* at 137. (The current version is G. L. c. 153, § 1.) This court held that the employer's negligence under the statute was circumscribed by the express or implied contract of employment, an essential element of which was the freedom of the employee to "take the risk of working where there are peculiar dangers from the arrangement of the place and from the kind or quality of the machinery used." *Id.* The court therefore concluded that there was "no doubt that one may

expressly contract to take the obvious risks of danger from inferior or defective machinery as well since the enactment of this statute as before. If he does so, his employer owes him no duty in respect to such risks . . . ." *Id.*

By "obvious risks," the court meant those attendant on a known danger, whether or not the employee "appreciates the particulars of the danger." The court was also careful to point out that assumption of the risk could not be presumed with respect to defects coming into existence after the making of the contract of employment if such future defects could not be deemed to have been contemplated at the time the contract was made. *Id.* at 137-138. The case could thus be read as limiting the employee's assumption of risks to those conditions of which he was aware and those risks which he voluntarily and knowingly undertook. This is, in essence, the distinction sometimes made between "ordinary" and "extraordinary" risks, categorizations to which we will return shortly. However, subsequent cases embellished the term "obvious risks" in the *O'Maley* formulation so that the employee was charged with assuming all risks that were "obvious or could have been discovered by a reasonable inspection." *Pilling* v. *Hall*, 251 Mass. 425, 427 (1925), and cases cited. This test is indistinguishable from the standard under the hidden defect test — that is, the defect is "hidden" when it could not have been discovered in the course of a reasonable inspection by the employee. *Pettingill* v. *Porter & Son, supra* at 349. In the one case the employee is deemed to have assumed the risks because the defect reasonably could have been discovered, while in the other case the employer owes him no duty of care because the defect reasonably could have been discovered and therefore was not "hidden."

Had the hidden defect test evolved in a manner that preserved the distinction between "ordinary" and "extraordinary" risks, it would have been unobjectionable. The ordinary risks of service are those that are not created by negligence or breach of duty on the part of the employer. 53 Am. Jur. 2d Master and Servant § 220 (1970), and collected

cases. Such risks would include those that are inherent in the job and of which the employee is fully aware. Thus, a person who voluntarily enters into a contract of employment to repair an old and visibly decrepit monument may be in a position to demand substantial remuneration for the risk he or she is taking, but cannot demand that the monument be fortified and made safe for climbing. Ordinary risks, in other words, are the truly obvious risks, knowingly and voluntarily undertaken. "Extraordinary" risks, on the other hand, are those that are created by the employer's negligence. *Id.*

We recognize that there are instances of hazardous employment where an independent contractor is engaged to do a particular task which presents inherent risk to the employees of that contractor. To some extent the hidden defect doctrine was developed to reflect an allocation of risk as between the employer (property owner) and the employee (independent contractor's employee) who accepts such employment. We do not here seek to preclude the continuation of such a proper allocation of risk between the parties nor to make the property owner an insurer against all loss. We feel the rule in its present form has obscured a proper allocation of such risks.

While it is theoretically possible that an employee could voluntarily transform an extraordinary risk into an ordinary risk by knowingly accepting the danger caused by the employer's negligence,[9] such a result should not quickly be assumed in view of the realities of the working environment and the advantageous position often enjoyed by the employer. A fortiori, it should not be incumbent on the employee to seek out and discover those defects or dangerous conditions that have compromised the safety of his or her working environment.

---

[9] This would arguably have been the situation had the plaintiff in the instant case voluntarily undertaken to climb the ladder after receiving a clear warning by the defendant that the ladder was defective and dangerous or that it had not been inspected over a long period of time. We need not reach this question, however, on the facts before us.

Recognition that an employee of an independent contrac-
tor should not be made to suffer the negligence of the prop-
erty owner simply would require the property owner to take
those steps to prevent injury that are reasonable and appro-
priate under all the circumstances. The duty and standard
of care owed by the property owner to the employee of an
independent contractor would thus be the same as that
owed all other lawful visitors on the premises. Those of us
who join in this part of the opinion feel that such rule is the
appropriate one to be followed consistently with the views
expressed in *Mounsey* and its progeny.

For the reasons stated, the judgment of the Superior
Court is affirmed.

*So ordered.*

QUIRICO, J. (with whom Hennessey, C.J., and Wilkins,
J., join, concurring in the result). This action was tried by
the parties and submitted to the jury on the plaintiff's claim
that he was injured by reason of a hidden or concealed de-
fect on the defendant's premises, of which defect the de-
fendant was aware or should have been aware through the
exercise of reasonable care. The jury returned a substantial
verdict for the plaintiff. The defendant appealed, contend-
ing that there was insufficient evidence to support the ver-
dict. The Appeals Court agreed, reversed the judgment and
vacated the verdict. On the plaintiff's appeal therefrom this
court is ordering that the verdict and judgment for the
plaintiff be reinstated, holding that the evidence was suffi-
cient to support the verdict. I concur with the result.

This case was briefed and argued by both parties before
the Appeals Court and this court on the assumption that it
was governed by the "hidden defect" rule, so called. It is my
opinion that this court's holding that the evidence was suffi-
cient to support a verdict for the plaintiff on that theory is
dispositive of this appeal. However, the court has chosen to
go beyond that and has declared, for the reasons discussed

in part 4 of the opinion, that the "hidden defect" rule "no longer is to be applied in cases involving tort actions against landowners."

I recognize that in an appropriate case expressly raising the issue, and in which we have the benefit of full briefing and argument on the subject, it may be advisable that we review our position on the "hidden defect" rule, and that much of the discussion contained in part 4 of the court's present opinion would be of significance in such a case. However, for all of the reasons stated above it is my opinion that this is not the appropriate case in which to abrogate the rule.

BRAUCHER, J. (concurring in the result). I do not agree with point 2 of the opinion of the court. In my view liability in the present case cannot be reconciled with nonliability in such cases as *Burr* v. *Massachusetts Elec. Co.*, 356 Mass. 144, 147 (1969), and *Hannon* v. *Hayes-Bickford Lunch Sys., Inc.*, 336 Mass. 268, 273-274 (1957). But I join in the balance of the court's opinion and in the result, particularly the overruling of the doctrine of *Afienko* v. *Harvard Club of Boston*, 365 Mass. 320, 327-328 (1974), limiting liability to cases where the defendant fails to disclose "hidden or concealed defects" of which "it was aware or should have been aware through the exercise of reasonable care."

The elimination of the doctrine restricting liability in such cases as the present one will not operate unfairly. Under G. L. c. 152, § 15, in its present form, the workman is entitled to workmen's compensation benefits, and need not choose between those benefits and his claim against the defendant town as a third party. His recovery in an action against the third party will be in part for the benefit of the workmen's compensation insurer. The third party can protect itself by obtaining from the workman's employer — the "independent contractor" — an agreement that the tank will be properly inspected before it is painted and that the workman's employer will hold the third party harmless for any injury to workmen like the plaintiff. The third party

can also protect itself by insurance against the liability imposed in the present case.

The restrictive doctrine is out of harmony with other developments. As the benefits provided by the workmen's compensation laws have come to seem inadequate in comparison with recoveries by tort claimants generally, courts have become increasingly tolerant of claims against third parties other than the employer. The Legislature has followed a similar policy in amending G. L. c. 152, § 15, to eliminate the requirement of election and the doctrine of common employment. St. 1971, c. 888 and c. 941. With the adoption of the doctrine of comparative negligence and the abolition of the defense of assumption of risk by G. L. c. 231, § 85, the Legislature has moved in the direction of the Federal Employers' Liability Act and other Federal statutes, under which juries are permitted to find employer negligence where fault is fictitious. See, e.g., *Caddy* v. *Texaco, Inc.*, 363 Mass. 36, 38 (1973).